**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| ORION LABS TECH, LLC, | |
| Plaintiff, | Civil Action No. 7:25-cv-00133-DC-DTG |
| v. | **JURY TRIAL DEMANDED** |
| SPRINKLR, INC., | |
| Defendant. | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Orion Labs Tech, LLC ("Orion Labs" or "Plaintiff") files this First Amended

Complaint against Defendant Sprinklr, Inc. ("Sprinklr" or "Defendant") alleging, based on its own

knowledge as to itself and its own actions, and based on information and belief as to all other

matters, as follows:

**NATURE OF THE ACTION**

1.    This is a patent infringement action to stop Sprinklr's infringement of the following

United States Patents (collectively, the "Asserted Patents") issued by the United States Patent and

Trademark Office ("USPTO"):

| U.S. Patent No. | Title | Available At |
|---|---|---|
| 1)  10,110,430 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10110430 |
| 2)  10,462,003 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10462003 |
| 3)  10,924,339 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10924339 |
| 4)  11,127,636 | Bot Group Messaging Using Bot-Specific Voice Libraries | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/11127636 |

| U.S. Patent No. | Title | Available At |
|---|---|---|
| 5) 11,258,733 | Transcription Bot For Group Communications | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/11258733 |

2.      Orion Labs seeks injunctive relief and monetary damages.

## PARTIES

3.      Orion Labs is a limited liability company formed under the laws of Washington with a registered office address located at 16935 SW 108th Ave, Tualatin, Oregon 97062 (Washington County).

4.      Based upon public information, Sprinklr is registered as a corporation organized and existing under the laws of Delaware.[1]

5.      Based upon public information, Sprinklr lists its "HQ" as being located at 441 9th Avenue, 12th Floor, New York, New York 10001.

6.      Based upon public information, Sprinklr has an office in this District at 2201 E. 6th Street, Austin, Texas 78702.[2]

7.      Based upon public information, Sprinklr may be served though its registered agent for service, Corporation Service Company, which is located at 251 Little Falls Drive, Wilmington, Delaware, 19808.  Based upon public information, Sprinklr may also be served though its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Inco, which is located at 211 E. 7th Street, Suite 620, Austin, Texas 78701.[3]

8.      Based upon public information, Sprinklr has an active Franchise Account Status with

---

[1] Last checked June 25, 2025.

[2] *See* https://www.sprinklr.com/contact-us/  (last visited June 25, 2025); *see also* SEC Filing dated June 24, 2025 (8K) at https://investors.sprinklr.com/financial-information/all-sec-filings/content/0001193125-25-145823/0001193125-25-145823.pdf

[3] Last checked June 25, 2025.

the Texas Comptroller of Public Accounts (ID No. 32050686107).[4]

9.      On information and belief based upon public information, Defendant directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells infringing products and services in the United States and in the State of Texas, including in this District, and otherwise directs infringing activities to this District in connection with its products and services.

## JURISDICTION AND VENUE

10.      Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

11.      This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

12.      Venue is proper against Defendant in this District pursuant to 28 U.S.C. § 1400(b) and 1391(c) because Defendant has maintained established and regular places of business in this District and has committed acts of patent infringement in this District from those regular and established places of business. *See In re: Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

13.      Defendant offers products and services, including through the use of Accused Products, and conducts business in this District.

14.      Defendant is subject to this Court's specific and general personal jurisdiction under due process due at least to Defendant's substantial business in this Judicial District, including: (i) at least a portion of the infringements alleged herein; (ii) regularly transacting, doing and/or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue

---

[4] Last checked June 25, 2025.

from goods and services provided to individuals in Texas and this District; (iii) having an interest in, using or possessing real property in Texas and this District; and (iv) having and keeping personal property in Texas and in this District.

15.     Specifically, Defendant intends to do and does business in, has and continues to commit acts of infringement in this District directly, and its employees, agents, and/or contractors located in this District use the products or services accused of infringement.

16.     On information and belief, Defendant owns, operates, manages, conducts business, and directs and controls the operations and employees of facilities at a location in this district, including, but not limited to, an office at the address identified above in Paragraph 6.

17.     Defendant has committed and continues to commit acts of infringement from its place of business in this District, including, but not limited to, making, using, selling, offering for sale, and importing of the Accused Products and inducement of third parties to use the Accused Products.

## THE ACCUSED PRODUCTS

18.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

19.     Based upon public information[5], Defendant owns, operates, advertises, and/or controls the website and domains www.sprinklr.com through which it advertises, sells, offers to sell, provides and/or educates customers about its products and services that utilize the Accused Products, as defined below.

20.     Defendant uses, causes to be used, sells, offers for sale, provides, supplies, or distributes its intelligent digital agents (hereinafter, the "Accused Products"), including but not

---

[5] *See* https://whois.domaintools.com/sprinklr.com (last visited: June 25, 2025)

limited to its Sprinklr Service, which it describes as an "AI-powered customer service platform that unifies customer queries from all traditional and modern support channels — like voice, digital and social media."[6].



*Figure 1:* Source – *see* FN 6

21.    As an example of the Accused Products, Defendant advertises that "Sprinklr Service has a plethora of features and is the right [Contact Center as a Service] provider because it is transparent with cost of ownership, data security, integration capabilities, scalability, and has a

---

[6] *See* https://www.sprinklr.com/products/customer-service/ (last visited June 25, 2025)

great vendor reputation."[7]

22.    The Accused Products, and in particular Sprinklr Service, provide a number of features related to automating customer service, including software for inbound voice contact support[8], outbound voice contact support[9]. social media contact support[10], live chat contact support[11], and community forums[12].



***Figure 2****: Source – see* FN 6

---

[7] *See* https://www.sprinklr.com/cxm/ccaas/ (last visited June 25, 2025)

[8] *See* https://www.sprinklr.com/products/customer-service/inbound-voice/ (last visited June 25, 2025)

[9] *See* https://www.sprinklr.com/products/customer-service/outbound-voice/ (last visited June 25, 2025)

[10] *See* https://www.sprinklr.com/products/customer-service/social-media-channels/ (last visited June 25, 2025)

[11] *See* https://www.sprinklr.com/products/customer-service/livechat/ (last visited June 25, 2025)

[12] *See* https://www.sprinklr.com/products/customer-service/community-forum/ (last visited June 25, 2025)

23. Defendant also instructs its customers, agents, employees, and affiliates regarding how to use the Accused Products.[13]



*Figure 3: Source - see FN 7*

24. For these reasons and the additional reasons detailed below, the Accused Products practice at least one claim of each of the Asserted Patents as described below and as supported by the Declaration of Ivan Zatkovich attached hereto (hereinafter, the ("Zatkovich Decl.").

---

[13] *See, e.g.,* https://www.sprinklr.com/cxm/topics/?sort=newest&category=service (last visited: June 25, 2025)

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,110,430**

25.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1-24 above as though fully set forth in their entirety.

26.     The USPTO duly issued U.S. Patent No. 10,110,430 (hereinafter, the "'430 patent") on December 1, 2016, after full and fair examination of Application No. 15/166,531, which was filed on May 27, 2016, which claims priority to a provisional application, filed on May 27, 2015. *See* '430 Patent.

27.     Orion Labs owns all substantial rights, interest, and title in and to the '430 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

28.     The claims of the '430 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.   Rather, the claimed inventions include inventive components and functionalities that improve upon the function and operation of managing communication groups and group communication systems.

29.     The written description of the '430 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

30.     The '430 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance and improve communication experiences. The intelligent agents can be members of a communication group and can perform various functions, such as recording communications, auditing

communications, and paging communication devices. The teachings of the '430 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system. *See* Zatkovich Decl., ¶19.

## A. The Technical Problems That Existed In The Art Of Electronic Inter And Intra-Group Communication Systems That Existed In May 2015.

31.     The specification of the '430 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015. *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶22.

32.     "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other tasks, it is often difficult to interface with the device (*e.g., i*n changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation." *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶23.

33.     There are significant contexts (e.g., emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2025 or today, be achieved with only humans in the group, without costly or even catastrophic results. *See* Zatkovich Decl., ¶24.

34.     Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group. Unless the group consisted of

individuals that were discretely trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information immediately, it would take time to get such persons into a group (if possible at all). And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets). *See* Zatkovich Decl., ¶25.

**B. The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).**

35.      As taught by the specification, the invention of the '430 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes unavailable. The inventions disclosed in the Intelligent Agent Patents, intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group. *See* Zatkovich Decl., ¶26.

36.      At its most basic, the invention provides "intelligent agent features to personal communication nodes (*e.g.,* wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software on one or more computing systems or devices." '430 patent at 1:37-47; *see also* Zatkovich Decl., ¶27.

37. The advances of the '430 patent in the critical and vital contexts of the sorts listed above include:

- The claimed instantiation is immediate, no matter what the circumstances;

- The instantiated intelligent agent is always fully and immediately functional;

- The capabilities of the intelligent agent are not limited to those of possibly available humans; and

- The intelligent agent is never fatigued or distracted.

*See* Zatkovich Decl., ¶28.

38. All of these advances provide the members of a communication group in contexts of the sorts listed above with needed outcomes not available if only humans were in the group. *See* Zatkovich Decl., ¶29.

39. Figure 1 illustrates a communication system:



**FIGURE 1**

40.      "Node **106** can be executed on a single processing or computing system, such as agent system **130**, or can be executed across multiple processing and/or computing systems. In some implementations, node **106** may be executed as a virtual node comprising software or firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other implementations node **106** can comprise virtualized software executed by a virtual machine that is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**, management system **120**, or agent system **130**. In some implementation, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a specific physical location, where specified locations can include a home or business server, a country of execution for distributed computing systems, and others). Moreover, when node **106** generates data and/or other information to be recorded, any of nodes **102-104** or management system **120** can specify where the records and/or data are to be stored (e.g., in a digital storage device, computer-readable medium associated with a particular computing node, a logical location, and/or a physical location)." '430 patent at 5:32-55; *see also* Zatkovich Decl., ¶31.

41.      Figure 2 depicts exemplary system **200** implementing intelligent agent features for use by personal communication nodes, such as nodes **102-104** of Figure 1.



**FIGURE 2**

*See* Zatkovich Decl., ¶32.

42.    "Intelligent agent system **210** comprises processing system **220** and communication system **221** which are implemented in and/or otherwise provided by one or more computing and communication systems system **220** and system **221** are shown as separate systems, though they may be combined and/or implemented in one or more computing systems. One exemplary implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises intelligent agent system **210** that includes, implements, deploys or otherwise generates intelligent agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent system are executed in a distributed computing environment, such as a cloud server or cloud system." '430 patent at 7:17-26, 33-38; *see also* Zatkovich Decl., ¶33.

43.    "Processing system **220** includes user interface system **222**, processing circuitry **223** and storage system **224**. Storage system **224** stores or otherwise includes software that comprises

intelligent agent **230**." '430 patent at 7:42-45.  Further,

> Processing circuitry **223** can comprise microprocessors, microcontrollers, and/or other circuitry that retrieves and executes software **225** from storage system **224**. Processing circuitry may comprise a single device or can be distributed across multiple devices, including devices in different geographic areas. Processing circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable storage medium, such as a disk drive, flash drive, data storage circuity, or some other hardware memory apparatus. . . . Storage system **224** may be embedded in various types of equipment. In some examples, a computer apparatus can comprise processing system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some implementations. Intelligent agent **230**, as shown in this non-limiting example, includes voice recognition module **231**, assistant module **232**, audit module **233**, recording module **234**, and security module **235**. In addition, software **225** (including intelligent agent **230**) may include operating systems, utilities, drivers, network interfaces, applications, and other software.

'430 patent at 8:4-27; *see also* Zatkovich Decl., ¶34.

44.    Ultimately, in general,

> *[S]oftware 403 can*, when loaded into processing circuit **408** and executed, *transform processing circuitry 408 from a general-purpose computing system into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. Encoding software 403 on storage system 402 can transform the physical structure of storage system 402*. The specific transformation of the physical structure can depend on various factors in different implementations of this description. Examples of such factors can include, but are not limited to the technology used to implement the storage media of storage system **402** and whether the computer-storage media are characterized as primary or secondary storage. For example, if the computer-storage media are implemented as semiconductor-based memory, software **403** can transform the physical state of the semiconductor memory when the program is encoded therein. For example, software **403** can transform the state of transistors, capacitors, or other discrete circuit elements constituting the semiconductor memory. A similar transformation can occur with respect to magnetic or optical media.

> Other transformations of physical media are possible without departing from the scope of the present description, with the foregoing examples provided only to facilitate this discussion.

'430 patent at 13:30-54 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl., ¶35.

### C. The Claims Of The '430 Patent Provide Technical Solutions To Problems With Inter And Intra-Group Electronic Communication Systems In May 2015.

45.    The '430 patent contains 17 total claims (three independent and fourteen dependent). This disclosure focuses on claim 7, though the same arguments (and more) apply to the other 16 claims in the patent, each of which requires even more specific technical steps than claim 7. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 7 recites:

> 7. A ***non-transitory computer readable storage medium having a distributed group communications application*** stored thereon, the distributed group communication application including instructions, which when executed by one or more processors of a group communication system, ***cause the group communication system to***:
>
> ***Receive instructions from at least one of the plurality of personal communication member nodes <u>operating as a communication group to instantiate an intelligent agent</u>***;
>
> ***<u>Instantiate the intelligent agent as a virtual assistant</u> communication member node*** in the communication group; and
>
> ***wherein the instantiated intelligent agent is <u>configured to record and audit communications</u> among and between the plurality of personal communication member nodes*** in the communication group.

'430 patent at claim 7 (emphasis added) *see also* Zatkovich Decl., ¶36.

46.    Several of the dependent claims to the independent claim are also presented below, which provide:

> 8. The non-transitory computer readable storage medium of claim 7 ***wherein <u>the instructions to instantiate an intelligent***</u>

*agent comprise voice instructions received by a first personal communication member node in the communication group*.

9. The non-transitory computer readable storage medium of claim 7 wherein *the intelligent agent is instantiated through a security handshake procedure to provide secure access to the intelligent agent by the plurality of personal communication node members as a secure communication member node* in the communication group.

10. The non-transitory computer readable storage medium of claim 7 wherein the intelligent agent is instantiated as a virtual assistant communication member node in the communication group *by a virtual machine in a cloud system*.

11. The non-transitory computer readable storage medium of claim 7 wherein *the intelligent agent is instantiated as a virtual assistant communication node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system* from the plurality of personal communication member nodes in the communication group.

12. The non-transitory computer readable storage medium of claim 7 wherein *each personal communication member node* in the plurality of personal communication member nodes *comprises a wearable push-to-talk communication device*.

'430 patent at claims 8-12 (emphasis added) *see also* Zatkovich Decl., ¶37.

47.    The other independent claims (claims 1 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in May 2015. These other independent claims claim intelligent agents using electronic communication groups with certain limitations not found in claim 7. *See* '430 patent at claim 1 (disclosing a method of managing a communication group that receives voice communications); claim 15 (disclosing that each personal communication member node comprises a user node transmitting and receiving communications between the group members and that the virtual assistant communication member node performs recording and auditing services for the communication group member nodes). The other dependent claims (2-8 and 14-17) roughly approximate dependent claims 8-12 above.

*Compare* 2 and 14 *with* 8; *compare* 3 and 15 *with* 9; *compare* 4 and 16 *with* 10; *compare* 5 and 17 *with* 11; *compare* 6 *with* 12.  *See* Zatkovich Decl., ¶38.

48.    Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of software algorithms and process descriptions.  *See* Zatkovich Decl., ¶39.

49.    The claims of the '430 patent are not directed to any abstract idea.  The claims of the '430 patent, including Claims 1, 7, and 13 are directed to a technical solution to problems that existed in May of 2015.  More specifically, the claimed subject matter overcame the problems that existed in May of 2015 with then-known inter and intra-group communications using the devices of the time.  It does so by removing the human element from such inter and intra-group communications automating the recording and auditing of such group communications through the use of a virtual assistant.  In general, the claims are specific in their boundaries, and those boundaries appear to be directly in accordance with the teachings of the '430 patent.  *See* Zatkovich Decl., ¶40.

50.    Moreover, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat.  The software functionality transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations.  '430 patent at 13:30-54.  The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by teaching intelligent agents deployed as a virtual assistant in communication groups to, among other

things, record and audit group communications. The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 10), as a security agent (claims 3, 9, and 17), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 5, 11, and 14), and where such member nodes form wearable push-to-talk communication devices (claims 6, 12, and 16). *See* Zatkovich Decl., ¶41.

51.     The foregoing claim elements are both concrete and specific in what they claim. For instance, these claims are directed to, among other things, the provision of electronic group communications managed by a virtual assistant with recording and auditing services that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.). *See* Zatkovich Decl., ¶42.

52.     Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper. The claims of the '430 patent, including Claim 7, are directed to a specific software that removes the human element from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices (mobile or otherwise). The claims here cannot be performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.). *See* Zatkovich Decl., ¶43.

53.     Finally, the claims of the '430 patent do not preempt all the ways of facilitating inter

and intra-group electronic communications.  There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted.  *See* '430 patent at 1, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '430 patent).  Also, the public can facilitate electronic inter and inter-group communications without the use of a virtual assistant and without recording and auditing controls in the electronic grouping.  *See* Zatkovich Decl., ¶44.

54.     Even if the '430 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and certainly would not have been considered conventional, routine, or generic to those skilled in the art).  The use of intelligent agents to manage electronic communication groups and record and audit such communications is inventive.  In fact, A POSITA would understand that each of the claims above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '430 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology.  *See* Zatkovich Decl., ¶45.

55.     Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-6, (B) independent claim 7, coupled with its various dependent claims 8-12, and (C) independent claim 13, coupled with its various dependent claims 14 to 17 of the '430 patent, as recited and described in detail above, were not well-known in the art.  A POSITA would not understand these claims to merely employ known generic components in a conventional or

routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure of specific software that removes the human element from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices. *See* Zatkovich Decl., ¶46.

56.     The complexity and specificity of the claimed systems and methods disclosed in the '430 patent claims is not equivalent to the defendant's analogy of using a court reporter in a court hearing or deposition. Notably, the examples of communication groups provided in the motion are entirely of calm and orderly contexts (*e.g.,* a court hearing or taking a deposition). A human, of course, can suffice in such contexts. As noted above, the main issue with using the technology existing in 2015 is that the limitations of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.) come into play under more extreme/demanding circumstances (*e.g.,* when round the clock instant and accurate responsiveness is required in a situation with distraction). *See* Zatkovich Decl., ¶47.

57.     For the above reasons, the claims of the '430 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl., ¶48.

### INFRINGEMENT

58.     Defendant has directly infringed one or more claims of the '430 patent by making, using, causing to be used, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing of the Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 7, and 13 of the

'430 patent, as detailed in **Exhibit A** (Evidence of Use of Infringement Regarding U.S. Patent No. 10,110,430).

59.     As an example of Defendant's infringement, as detailed in Exhibit A, the Accused Products infringe at least independent Claim 1 of the '430 patent by providing a method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent recording and auditing communications among and between the plurality of personal communication member nodes in the communication group.   The intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system from the plurality of personal communication member nodes in the communication group.

60.     Further examples of Defendant's infringement of independent claims 7 and 13 of the '430 patent are described in detail in Exhibit A, which also includes element-by-element support for the presence of each element of each of claims 7 and 13.

61.     Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '430 patent.

62.     Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed one or more claims of the '430 patent by inducing others to directly infringe said claims.  Defendant has induced distributors and end-users, including, but not limited

to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '430 patent by providing or requiring use of the Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products. in a manner that infringes one or more claims of the '430 patent, including, for example, claims 1, 7, and 13.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products. in an infringing manner; advertising and promoting the use of the Accused Products. in an infringing manner; or distributing instructions that guide users to use the Accused Products. in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '430 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products. by others would infringe the '430 patent.

63.    Defendant has also indirectly infringed by contributing to the infringement of the '430 patent.  Defendant has contributed to the direct infringement of the '430 patent by its personnel, contractors, distributors, and customers.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '430 patent, including, for example, claims 1, 7, and 13.  Said special features, which are identified in Paragraphs 20-23, *supra*, constitute a material part of the invention of at least claims 1, 7, and 13 of the '430 patent when used by the Accused Products in a normal manner and are not staple articles of commerce suitable for substantial non-infringing use.

64.    Defendant had knowledge of the '430 patent and its infringing activities at least as of the date when it was notified of the filing of this action.

65.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

66.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

67.     Defendant's direct infringement of one or more claims of the '430 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

68.     Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Orion Labs in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

69.     Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '430 patent. Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology. The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,462,003

70.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1-24 above as though fully set forth in their entirety.

71.     The USPTO duly issued U.S. Patent No. 10,462,003 (hereinafter, the "'003 patent") on October 29, 2019, after full and fair examination of Application No. 16/142,314, which was

filed on September 26, 2018, and which claims priority to the '430 patent.  *See* '003 patent.

72.    Orion Labs owns all substantial rights, interest, and title in and to the '003 patent, including the sole and exclusive right to prosecute this action and enforce the '003 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY[14]

73.    The claims of the '003 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.   Rather, the claimed inventions include inventive components that improve upon the function and operation of managing communication groups, distributed group communications, and group communication systems.

74.    The written description of the '003 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

75.    In general, the '003 patent is directed to "communications and, in particular, to intelligent agents usable with communication groups."  '003 patent at 1:20-22.  The '003 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance and improve communication experiences. The intelligent agents can be members of a communication group and can perform various functions, including providing ad hoc services to the group like voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search,

---

[14] Because the '003 patent is a continuation of the '430 patent, citations to the '430 patent in the following sub-sections are referenced.

transcription, and annotation functions. The teachings of the '003 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system and can provide ad hoc services to the group, including recording, auditing, searching, transcription, and annotation of communications. *See* Zatkovich Decl., ¶30.

**A. The Technical Problems That Existed In The Art Of Electronic Inter And Intra-Group Communication Systems That Existed In May 2015.**

76.     The specification of the '003 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015. *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶22.

77.     "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other tasks, it is often difficult to interface with the device (*e.g., i*n changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation." *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶23.

78.     There are significant contexts (*e.g.,* emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2025 or today, be achieved with only humans in the group, without costly or even catastrophic results. *See* Zatkovich Decl., ¶24.

79.     Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group.  Unless the group consisted of individuals that were discretely trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information immediately, it would take time to get such persons into a group (if possible at all).  And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets).  *See* Zatkovich Decl., ¶25.

**B.  The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).**

80.     As taught by the specification, the invention of the '003 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes unavailable.  The inventions disclosed in the Intelligent Agent Patents, intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group.  *See* Zatkovich Decl., ¶26.

81.     At its most basic, the invention provides "intelligent agent features to personal communication nodes (*e.g.,* wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software

on one or more computing systems or devices." '430 patent at 1:37-47; *see also* Zatkovich Decl.,

¶27.

82.     The advances of the '003 patent in the critical and vital contexts of the sorts listed

above include:

- The claimed instantiation is immediate, no matter what the circumstances;

- The instantiated intelligent agent is always fully and immediately functional;

- The capabilities of the intelligent agent are not limited to those of possibly available humans; and

- The intelligent agent is never fatigued or distracted.

*See* Zatkovich Decl., ¶28.

83.     All of these advances provide the members of a communication group in contexts of

the sorts listed above with needed outcomes not available if only humans were in the group. *See*

Zatkovich Decl., ¶29.

84.    Figure 1 illustrates a communication system:



**FIGURE 1**

85.    "Node **106** can be executed on a single processing or computing system, such as agent system **130**, or can be executed across multiple processing and/or computing systems. In some implementations, node **106** may be executed as a virtual node comprising software or firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other implementations node **106** can comprise virtualized software executed by a virtual machine that is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**, management system **120**, or agent system **130**. In some implementation, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a specific physical location, where specified locations can

include a home or business server, a country of execution for distributed computing systems, and

others). Moreover, when node **106** generates data and/or other information to be recorded, any of

nodes **102-104** or management system **120** can specify where the records and/or data are to be

stored (e.g., in a digital storage device, computer-readable medium associated with a particular

computing node, a logical location, and/or a physical location)." '430 patent at 5:32-55; *see also*

Zatkovich Decl., ¶31.

86.    Figure 2 depicts exemplary system **200** implementing intelligent agent features for use

by personal communication nodes, such as nodes **102-104** of Figure 1.



**FIGURE 2**

*See* Zatkovich Decl., ¶32.

87.    "Intelligent agent system **210** comprises processing system **220** and communication

system **221** which are implemented in and/or otherwise provided by one or more computing and

communication systems system **220** and system **221** are shown as separate systems, though they

may be combined and/or implemented in one or more computing systems. One exemplary

implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises intelligent agent system **210** that includes, implements, deploys or otherwise generates intelligent agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent system are executed in a distributed computing environment, such as a cloud server or cloud system." '430 patent at 7:17-26, 33-38; *see also* Zatkovich Decl., ¶33.

88.     "Processing system **220** includes user interface system **222**, processing circuitry **223** and storage system **224**. Storage system **224** stores or otherwise includes software that comprises intelligent agent **230**." '430 patent at 7:42-45.  Further,

> Processing circuitry **223** can comprise microprocessors, microcontrollers, and/or other circuitry that retrieves and executes software **225** from storage system **224**. Processing circuitry may comprise a single device or can be distributed across multiple devices, including devices in different geographic areas. Processing circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable storage medium, such as a disk drive, flash drive, data storage circuity, or some other hardware memory apparatus. . . . Storage system **224** may be embedded in various types of equipment. In some examples, a computer apparatus can comprise processing system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some implementations. Intelligent agent **230**, as shown in this non-limiting example, includes voice recognition module **231**, assistant module **232**, audit module **233**, recording module **234**, and security module **235**. In addition, software **225** (including intelligent agent **230**) may include operating systems, utilities, drivers, network interfaces, applications, and other software.

'430 patent at 8:4-27; *see also* Zatkovich Decl., ¶34.

89.     Ultimately, in general,

> *[S]oftware 403 can*, when loaded into processing circuit **408** and executed, *transform processing circuitry 408 from a general-purpose computing system into a special-purpose computing*

> ***system customized to operate as described herein for a
> management node, personal communication node, or agent node,
> among other operations. Encoding software 403 on storage system
> 402 can transform the physical structure of storage system 402.***
> The specific transformation of the physical structure can depend on
> various factors in different implementations of this description.
> Examples of such factors can include, but are not limited to the
> technology used to implement the storage media of storage system
> **402** and whether the computer-storage media are characterized as
> primary or secondary storage. For example, if the computer-storage
> media are implemented as semiconductor-based memory, software
> **403** can transform the physical state of the semiconductor memory
> when the program is encoded therein. For example, software **403**
> can transform the state of transistors, capacitors, or other discrete
> circuit elements constituting the semiconductor memory. A similar
> transformation can occur with respect to magnetic or optical media.
> Other transformations of physical media are possible without
> departing from the scope of the present description, with the
> foregoing examples provided only to facilitate this discussion.

'430 patent at 13:30-54 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl., ¶35.

### C. The Claims Of The '003 Patent Provide Technical Solutions To Problems With Intelligent Agent Features For Wearable Personal Communication Nodes In May 2015.

90.     The '003 patent contains 23 total claims (three independent and twenty dependent).
This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 22
claims in the patent, each of which requires even more specific technical steps than claim 1.
Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture
the technical solutions taught in the specification.  Claim 1 is provided below:

> 1. A method of ***managing a communication group,
> wherein the communication group comprises a plurality of
> personal communication member nodes***, the method comprising:
>
>> ***receiving instructions from at least one of the plurality of
>> personal communication member nodes to:***
>>
>>> ***instantiate an intelligent agent***; and
>>>
>>> ***where to instantiate the intelligent agent***;

> *instantiating the intelligent agent as a virtual assistant communication member node* in the communication group; and

> *the instantiated intelligent agent performing a service for one or more personal communication member nodes* in the communication group.

'003 patent at claim 1 (emphasis added). Several of the dependent claims to the independent claim are also presented below, which provide:

> 2.    The method of claim **1** wherein receiving *instructions to instantiate the intelligent agent comprises receiving voice instructions through a first personal communication member node in the communication group*.

> 3.    The method of claim **1** wherein *the intelligent agent is instantiated through a security handshake procedure to provide secure access to the intelligent agent by the plurality of personal communication node members as a secure communication member node* in the communication group.

> 4.    The method of claim **1** wherein *the service comprises at least one of the following: recording communications among and between the plurality of personal communication nodes; auditing communications among and between the plurality of personal communication nodes; performing a search; performing audio transcription; and annotating communications*.

> 5.    The method of claim **1** wherein *the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a virtual machine in a cloud system*.

> 6.    The method of claim **1** wherein *the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system* from the plurality of personal communication member nodes in the communication system.

> 7.    The method of claim **1** wherein *each personal communication member node* in the plurality of personal communication member nodes *comprises a wearable push-to-talk communication device*.

16. The method of claim 15 wherein **the communication group is defined by a _management system_ based on _attribute information_** transferred to the management system by the member nodes and is **updated based on _changes to the attribute information_**.

20. The method of claim 15 wherein communications between the communication group member nodes are **_encrypted_ and further wherein the virtual assistant communication member node is _securely linked to the communication group_**.

21. The method of claim 1, wherein where **to instantize the intelligent agent is at least one of the following: _a specific host node, a specific physical location, a virtual machine executed on at least one of: personal communication member nodes, a management system, and an agent system_**.

22. The non-transitory computer readable storage medium of claim 8 wherein the received instructions of where to instantiate **an intelligent agent further comprise the intelligent agent to _instantize_ at least one of the following: a specific _host node_, a specific _physical location_, a _virtual machine_ executed on at least one of: personal communication member nodes, a management system, and an agent system**.

23. The method of claim 15, wherein where **to instantize the intelligent agent is at least one of the following: _a specific host node, a specific physical location, a virtual machine_ executed on at least one of: personal communication member nodes, a management system, and an agent system**.

'003 patent at claims 2-7, 21 (emphasis added); *see also* Zatkovich Decl., ¶54.

91.    The other independent claims (claims 8 and 15) are also directed to subject matter that provided technical solutions to technical problems in inter and intra-group electronic communication that existed in May 2015.  Specifically, these other independent claim electronic communication groups managed by intelligent agents with certain limitations not found in claim 1. *See* '003 patent at claim 8 (disclosing that at least one of a plurality of personal communication member nodes operates as a communication group and that the instantiated intelligent agent is configured to record and audit communications among and between the plurality of personal

communication member nodes in the communication group); claim 15 (disclosing a method of operating a group communication system, comprising, among other elements, that each personal communication node comprises a user node transmitting and receiving communications between the group members and that the virtual assistant communication member node performs recording and auditing services for the communication group member nodes). The other dependent claims (2-7 and 16-23) roughly approximate dependent claims 1-7 above. *Compare* 9 and 17 *with* 2; *compare* 10 *with* 3; *compare* 11 and 18 *with* 4; *compare* 12 *with* 5; *compare* 13 *with* 6; *compare* 14 and 18 *with* 7. *See* Zatkovich Decl., ¶55.

92. The claims of the '003 patent are not directed to any abstract idea. The claims of the '003 patent, including Claims 1, 8, and 15 are directed to technical solutions to problems that existed in May of 2015. More specifically, the claimed subject matter overcame the problems that existed in May of 2015 with then-known inter and intra-group communications using the devices of the time. It does so by removing the human element and limitations on the availability of trained personnel from such inter and intra-group communications, providing discrete services to such groups (i.e., voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) on communication devices (mobile or otherwise) and automating the recording and auditing of such group communications through the use of a virtual assistant. In general, the claims are specific in their boundaries, and those boundaries are directly in accordance with the teachings of the '003 patent. *See* Zatkovich Decl., ¶56.

93. As noted above, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat. The software functionality

transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. '003 patent at 13:30-54. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by disclosing and teaching intelligent agents deployed as a virtual assistant in communication groups to provide ad hoc group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions to a group. The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 12), as a security agent with a security handshake procedure (claims 3, 10, and 20), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 6 and 13), where such member nodes form wearable push-to-talk communication devices (claims 7, 14, and 19), and where such groups are location specific (claim 21). *See* Zatkovich Decl., ¶57.

94.    The foregoing claim elements are both concrete and specific in what they claim. For instance, these claims are directed to, among other things, the provision of discrete ad hoc services in electronic communication groups (*i.e.,* voice, security, management operations, sub-grouping, search, transcription, and annotation functions) that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.) and limitations on accessibility and resources to provide ad hoc services due to training or skillset (ability to provide voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search,

transcription, and annotation functions) to a group).  *See* Zatkovich Decl., ¶58.

95.    Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '003 patent, including Claim 1, are directed to a specific software that removes the human element from inter and intra-group communications and automates the provision of group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions record and audit group communications on communication devices (mobile or otherwise).  The claims here cannot be performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.) and due to the accessibility of personnel to provide ad hoc services (a person that can transcribe, annotate, provide security, manage, or search for information) to a group.  *See* Zatkovich Decl., ¶59.

96.    Finally, the claims of the '003 patent do not preempt all the ways of facilitating inter and intra-group electronic communications.  There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted.  *See* '003 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '003 patent).  Also, the public can facilitate electronic inter and inter-group communications without providing services of the type listed above (voice, security, management operations, sub-grouping, search, transcription, and annotation functions) and without a virtual assistant.  *See* Zatkovich Decl., ¶60.

97.    Even if the '003 patent claims were directed at an abstract idea (which they are not),

the claims capture subject matter that is inventive. To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and certainly would not have been considered conventional, routine, or generic to those skilled in the art). The creation and use of electronic communication groups with an intelligent agent(s) and the provision of voice, security, management operations, sub-grouping, search, transcription, and annotation functions is inventive. In fact, A POSITA would understand that each of the claims above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '003 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology. *See* Zatkovich Decl., ¶61.

98.    Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, and (C) independent claim 15, coupled with its various dependent claims 16 to 23 of the '003 patent, as recited and described in detail above, were not well-known in the art. A POSITA would not understand these claims to merely employ known generic components in a conventional or routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure of specific software that removes the human element and issues with the availability of trained individuals from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication

devices.  *See* Zatkovich Decl., ¶62.

99.    For the above reasons, the claims of the '003 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea).  *See* Zatkovich Decl., ¶63.

### INFRINGEMENT

100.    Defendant has directly infringed and continues to infringe one or more claims of the '003 patent by making, using, causing to be used, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing of the Accused Products.  For instance, Defendant has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claims 1, 4, 8, 11, 15, 16. and 17 of the '003 patent, as detailed in **Exhibit B** (Evidence of Use Regarding Infringement of U.S. Patent No. 10,462,003).

101.    As an example of Defendant's infringement, as detailed in Exhibit B, the Accused Products infringe at least Claim 1 of the '003 patent by performing a method managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to: instantiate an intelligent agent; and where to instantiate the intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent performing a service for one or more personal communication member nodes in the communication group.  The Accused Products comprise at least one of the following: recording communications among and between the plurality of personal communication nodes; auditing communications among and between the plurality of personal communication nodes; performing a search; performing audio transcription; and annotating communications.

102.    Further examples of Defendant's infringement of independent claims 8 and 15 and

dependent claims 4, 11, 16, and 17 of the '003 patent are described in detail in <u>Exhibit B</u>, which also includes element-by-element support for the presence of each element of each of claims 4, 11, 16, and 17.

103.     Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '003 patent.

104.     Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed one or more claims of the '003 patent by inducing others to directly infringe said claims.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '003 patent by providing or requiring use of the Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '003 patent, including, for example, claims 1, 4, 8, 11, 15, and 17.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '003 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products by others would infringe the '003 patent.

105.     Defendant has also indirectly infringed by contributing to the infringement of the '003 patent.  Defendant has contributed to the direct infringement of the '003 patent by its personnel,

contractors, distributors, and customers.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '003 patent, including, for example, claims 1, 4, 8, 11, 15, and 17.  Said special features, which are identified in Paragraphs 20-23, *supra*, constitute a material part of the invention of at least claims 1, 4, 8, 11, 15, and 17 of the '003 patent when used by the Accused Products in a normal manner and are not staple articles of commerce suitable for substantial non-infringing use.

106.    Defendant had knowledge of the '003 patent and its infringing activities at least as of the date when it was notified of the filing of this action.

107.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

108.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

109.    Defendant's direct infringement of one or more claims of the '003 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

110.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

111.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer

this harm by virtue of Defendant's infringement of the '003 patent. Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology. The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,924,339

112.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1-24 above as though fully set forth in their entirety.

113.    The USPTO duly issued U.S. Patent No. 10,924,339 (hereinafter, the "'339 patent") on February 16, 2021 after full and fair examination of Application No. 16/665,866 which was filed on October 28, 2019, which claims priority to the '003 patent which claims priority to the '430 patent. *See* '339 patent.

114.    Orion Labs owns all substantial rights, interest, and title in and to the '339 patent, including the sole and exclusive right to prosecute this action and enforce the '339 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY[15]

115.    The claims of the '339 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of communication groups and personal communication member nodes, distributed group communication applications, and group communication systems.

---

[15] Because the '339 patent is a continuation of the '430 patent, citations to the '430 patent in the following sub-sections are referenced.

116.    The written description of the '339 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

117.    In general, the '339 patent is directed to "communications and, in particular, to intelligent agents usable with communication groups." '339 patent at 1:23-25. The '339 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance and improve communication experiences. The intelligent agents are instantiated as a virtual assistant that can transcribe communications in the group. The teachings of the '339 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system.  *See* Zatkovich Decl., ¶65.

A. **The Technical Problems That Existed In The Art Of Electronic Inter And Intra-Group Communication Systems That Existed In May 2015.**

118.    The specification of the '339 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015.  *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶22.

119.    "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other

tasks, it is often difficult to interface with the device (*e.g., i*n changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation." *See* '430 patent at 1:20-33; *see also* Zatkovich Decl., ¶23.

120.    There are significant contexts (e.g., emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2025 or today, be achieved with only humans in the group, without costly or even catastrophic results. *See* Zatkovich Decl., ¶24.

121.    Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group. Unless the group consisted of individuals that were discretely trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information immediately, it would take time to get such persons into a group (if possible at all). And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets). *See* Zatkovich Decl., ¶25.

### B. The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).

122.    As taught by the specification, the invention of the '339 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes unavailable. The inventions disclosed in the Intelligent Agent Patents, intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-

grouping by group-provided attributes, and search, transcription, and annotation functions) to a group. *See* Zatkovich Decl., ¶26.

123.    At its most basic, the invention provides "intelligent agent features to personal communication nodes (*e.g.,* wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software on one or more computing systems or devices." '430 patent at 1:37-47; *see also* Zatkovich Decl., ¶27.

124.    The advances of the '339 patent in the critical and vital contexts of the sorts listed above include:

- The claimed instantiation is immediate, no matter what the circumstances;

- The instantiated intelligent agent is always fully and immediately functional;

- The capabilities of the intelligent agent are not limited to those of possibly available humans; and

- The intelligent agent is never fatigued or distracted.

*See* Zatkovich Decl., ¶28.

125.    All of these advances provide the members of a communication group in contexts of the sorts listed above with needed outcomes not available if only humans were in the group. *See* Zatkovich Decl., ¶29.

126.    Figure 1 illustrates a communication system:



**FIGURE 1**

127.    "Node **106** can be executed on a single processing or computing system, such as agent system **130**, or can be executed across multiple processing and/or computing systems. In some implementations, node **106** may be executed as a virtual node comprising software or firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other implementations node **106** can comprise virtualized software executed by a virtual machine that is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**, management system **120**, or agent system **130**. In some implementation, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a specific physical location, where specified locations can

include a home or business server, a country of execution for distributed computing systems, and others). Moreover, when node **106** generates data and/or other information to be recorded, any of nodes **102-104** or management system **120** can specify where the records and/or data are to be stored (e.g., in a digital storage device, computer-readable medium associated with a particular computing node, a logical location, and/or a physical location)." '430 patent at 5:32-55; *see also* Zatkovich Decl., ¶31.

128.    Figure 2 depicts exemplary system **200** implementing intelligent agent features for use by personal communication nodes, such as nodes **102-104** of Figure 1.



**FIGURE 2**

*See* Zatkovich Decl., ¶32.

129.    "Intelligent agent system **210** comprises processing system **220** and communication system **221** which are implemented in and/or otherwise provided by one or more computing and communication systems system **220** and system **221** are shown as separate systems, though they may be combined and/or implemented in one or more computing systems. One exemplary

implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises

intelligent agent system **210** that includes, implements, deploys or otherwise generates intelligent

agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that

includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent

system are executed in a distributed computing environment, such as a cloud server or cloud

system." '430 patent at 7:17-26, 33-38; *see also* Zatkovich Decl., ¶33.

130.    "Processing system **220** includes user interface system **222**, processing circuitry **223**

and storage system **224**. Storage system **224** stores or otherwise includes software that comprises

intelligent agent **230**." '430 patent at 7:42-45.  Further,

> Processing circuitry **223** can comprise microprocessors,
> microcontrollers, and/or other circuitry that retrieves and executes
> software **225** from storage system **224**. Processing circuitry may
> comprise a single device or can be distributed across multiple
> devices, including devices in different geographic areas. Processing
> circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable
> storage medium, such as a disk drive, flash drive, data storage
> circuity, or some other hardware memory apparatus. . . . Storage
> system **224** may be embedded in various types of equipment. In
> some examples, a computer apparatus can comprise processing
> system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some
> implementations. Intelligent agent **230**, as shown in this non-
> limiting example, includes voice recognition module **231**, assistant
> module **232**, audit module **233**, recording module **234**, and security
> module **235**. In addition, software **225** (including intelligent agent
> **230**) may include operating systems, utilities, drivers, network
> interfaces, applications, and other software.

'430 patent at 8:4-27; *see also* Zatkovich Decl., ¶34.

131.    Ultimately, in general,

> *[S]oftware 403 can*, when loaded into processing circuit **408** and
> executed, *transform processing circuitry 408 from a general-*
> *purpose computing system into a special-purpose computing*

> *system customized to operate as described herein for a*
> *management node, personal communication node, or agent node,*
> *among other operations. Encoding software 403 on storage system*
> *402 can transform the physical structure of storage system 402.*
> The specific transformation of the physical structure can depend on
> various factors in different implementations of this description.
> Examples of such factors can include, but are not limited to the
> technology used to implement the storage media of storage system
> **402** and whether the computer-storage media are characterized as
> primary or secondary storage. For example, if the computer-storage
> media are implemented as semiconductor-based memory, software
> **403** can transform the physical state of the semiconductor memory
> when the program is encoded therein. For example, software **403**
> can transform the state of transistors, capacitors, or other discrete
> circuit elements constituting the semiconductor memory. A similar
> transformation can occur with respect to magnetic or optical media.
> Other transformations of physical media are possible without
> departing from the scope of the present description, with the
> foregoing examples provided only to facilitate this discussion.

'430 patent at 13:30-54 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl., ¶35.

### C. The Claims Of The '339 Patent Provide Technical Solutions To Problems With Intelligent Agent Features For Wearable Personal Communication Nodes In May 2015.

132.    The '339 patent contains 20 total claims (three independent and seventeen dependent).

This disclosure focuses on claim 8, though the same arguments (and more) apply to the other 19

claims in the patent, each of which requires even more specific technical steps than claim 8.

Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture

the technical solutions taught in the specification.  Claim 8 is provided below:

> 8.    A ***non-transitory computer readable storage***
> ***medium having a distributed group communications***
> ***application stored thereon***, the distributed group
> communication application including instructions, which when
> executed by one or more processors of a group communication
> system, cause the group communication system to:
>
> *receive instructions from at least one of a plurality of*
> *personal communication member nodes operating as a*
> *communication group to instantiate an intelligent agent*; and

> ***instantiating the intelligent agent as a virtual assistant communication member node*** in the communication group; and

> ***wherein the <u>instantiated intelligent agent is configured to transcribe communications</u> among and between the plurality of personal communication member nodes*** in the communication group.

'339 patent at claim 1 (emphasis added). Several of the dependent claims to the independent claim are also presented below, which provide:

> 9. The non-transitory computer readable storage medium of claim 8 wherein ***<u>the instructions to instantiate an intelligent agent comprise voice instructions</u> received by a first personal communication member node in the communication group***.

> 10. The non-transitory computer readable storage medium of claim 8 wherein ***the intelligent agent is instantiated through a <u>security handshake procedure to provide secure access</u> to the intelligent agent by the plurality of personal communication node members as a secure communication member node*** in the communication group.

> 11. The non-transitory computer readable storage medium of claim 8 wherein ***the <u>instantiated intelligent agent transcribing communications</u> among and between the plurality of personal communication member nodes comprises one of the following:***

> ***<u>audio transcription of non-audio communications</u>; or***

> ***<u>textual transcription of audio communications</u>***.

> 12. The non-transitory computer readable storage medium of claim 8 wherein ***the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a <u>virtual machine in a cloud system</u>***.

> 13. The non-transitory computer readable storage medium of claim 8 wherein ***the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a <u>management system</u> configured to define the communication group <u>based on attribute information transferred to the management system</u>*** from the plurality of personal communication member nodes in the communication system.

14.    The non-transitory computer readable storage medium of claim 8 wherein *each personal communication member node* in the plurality of personal communication member nodes *comprises a wearable push-to-talk communication device*.

18. The method of claim 15 further comprising *storing transcribed communications*.

'339 patent at claims 2-7 (emphasis added); *see also* Zatkovich Decl., ¶69.

133.    The other independent claims (claims 1 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in May 2015.    These other independent claims are directed to forms of software and systems not found in claim 1.  *See* '339 patent at claim 1 (disclosing that the instantiated intelligent agent is configured to transcribe communications among and between the plurality of personal communication member nodes in the communication group); claim 15 (disclosing that each personal communication member node comprises a user node transmitting and receiving communications between the group members and instantiating the intelligent agent as a virtual assistant communication member code of the communication group, wherein the virtual assistant communication member node performs transcription services for the communication group member nodes). The other dependent claims (2-7 and 15-20) roughly approximate dependent claims 8-12 above.  *Compare* 2 and 17 *with* 9; *compare* 3 and 20 *with* 10; *compare* 4 and 19 *with* 11; *compare* 5 *with* 12; *compare* 6 and 16 *with* 13; and *compare* 7 *with* 14.  *See* Zatkovich Decl., ¶70.

134.    The claims of the '339 patent are not directed to any abstract idea.  The claims of the '339 patent, including Claims 1, 8, and 15 are directed to technical solutions to problems that existed in May of 2015.  More specifically, the claimed subject matter overcame the problems that existed in May of 2015 with then-known inter and intra-group communications using the communication devices that existed at that time.  It does so by removing the human element and

limitations on the availability of trained personnel from such inter and intra-group communications, providing discrete transcription services to such groups (on communication devices (mobile or otherwise) through the use of a virtual assistant. In general, the claims are specific in their boundaries, and those boundaries are directly in accordance with the teachings of the '339 patent. *See* Zatkovich Decl., ¶71.

135.    As noted above, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat. The software functionality transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. '339 patent at 13:30-54. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by disclosing and teaching intelligent agents deployed as a virtual assistant in communication groups to provide ad hoc group services in the form of, among other things, transcription services to a group. The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 12), as a security agent with a security handshake procedure (claims 3, 10, and 20), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 6, 13, and 16), where such member nodes form wearable push-to-talk communication devices (claims 7 and 14), and where such transcription services are one of audio or textual transcription (claims 4, 11, and 19). *See* Zatkovich Decl., ¶72.

136.    The foregoing claim elements are both concrete and specific in what they claim. For

instance, these claims are directed to, among other things, the provision of discrete ad hoc services in electronic communication groups (*i.e.,* transcription, security, command, and management services) that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.) and limitations on accessibility and resources to provide ad hoc services due to training or skillset (ability to provide voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and transcription functions) to a group. *See* Zatkovich Decl., ¶73.

137.     Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper. The claims of the '339 patent, including Claim 1, are directed to a specific software that removes the human element from inter and intra-group communications and automates the provision of group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and transcription functions for communications on communication devices (mobile or otherwise). The claims here cannot be performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.) and due to the accessibility of personnel to provide ad hoc services (*e.g.*, a person that can transcribe, annotate, provide security, manage) to a group. *See* Zatkovich Decl., ¶74.

138.     Finally, the claims of the '339 patent do not preempt all the ways of facilitating inter and intra-group electronic communications. There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted. *See* '339 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the

examiner and/or referenced by the patentee during prosecution of the '339 patent). Also, the public can facilitate electronic inter and inter-group communications without providing services of the type listed above (voice, security, management operations, sub-grouping, and transcription) and without a virtual assistant. *See* Zatkovich Decl., ¶75.

139.    Even if the '339 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive. To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and would not have been considered conventional, routine, or generic to those skilled in the art). The creation and use of electronic communication groups with an intelligent agent(s) and the provision of voice, security, management operations, sub-grouping, and transcription functions is inventive. In fact, A POSITA would understand that each of the claims above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '339 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology. *See* Zatkovich Decl., ¶76.

140.    Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, and (C) independent claim 15, coupled with its various dependent claims 16 to 20 of the '339 patent, as recited and described in detail above, were not well-known in the art. A POSITA would not understand these claims to merely employ known generic components in a conventional or routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure

of specific software that removes the human element and issues with the availability of trained individuals to provide ad hoc services to inter and intra-group communications and automates transcription of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices.  *See* Zatkovich Decl., ¶77.

141.    For the above reasons, the claims of the '339 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea).  *See* Zatkovich Decl., ¶78.

**INFRINGEMENT**

142.    Defendant has directly infringed one or more claims of the '339 patent by using, providing, supplying, or distributing the Accused Products.  For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 4, 8, 11, 15, 18, and 19 of the '339 patent, as detailed in **Exhibit C** (Evidence of Use Regarding Infringement of U.S. Patent No. 10,924,339).

143.    As an example of Defendant's infringement, as detailed in Exhibit C, the Accused Products infringe at least Claim 1 of the '339 patent by performing a method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent transcribing communications among and between the plurality of personal communication member nodes in the communication group. The instantiated intelligent agent transcribing communications among and between the plurality of personal communication member nodes comprises one of the following: audio transcription of

non-audio communications; or textual transcription of audio communications.

144.    Further examples of Defendant's infringement of independent claims 8 and 15 and dependent claims 4, 11, 18, and 19 of the '339 patent are described in detail in <u>Exhibit C</u>, which also includes element-by-element support for the presence of each element of each of claims 4, 11, 18, and 19.

145.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '339 patent.

146.    Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed one or more claims of the '339 patent by inducing others to directly infringe said claims.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '339 patent by providing or requiring use of the Accused Products,.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products, in a manner that infringes one or more claims of the '339 patent, including, for example, claims 1, 4, 8, 11, 15, 18, and 19.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products, in an infringing manner; advertising and promoting the use of the Accused Products, in an infringing manner; or distributing instructions that guide users to use the Accused Products, in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '339 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products, by others would infringe the '339 patent.

147.    Defendant has also indirectly infringed by contributing to the infringement of the '339 patent. Defendant has contributed to the direct infringement of the '339 patent by its personnel, contractors, distributors, and customers. The Accused Products, have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '339 patent, including, for example, claims 1, 4, 8, 11, 15, 18, and 19. Said special features, which are identified in Paragraphs 20-23, *supra*, constitute a material part of the invention of at least claims 1, 4, 8, 11, 15, 18, and 19 of the '339 patent when used by the Accused Products in a normal manner and are not staple articles of commerce suitable for substantial non-infringing use.

148.    Defendant had knowledge of the '339 patent and its infringing activities at least as of the date when it was notified of the filing of this action.

149.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

150.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

151.    Defendant's direct infringement of one or more claims of the '339 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

152.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

153.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '339 patent. Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology. The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 11,127,636

154.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1-24 above as though fully set forth in their entirety.

155.    The United States Patent and Trademark Office ("USPTO") duly issued U.S. Patent No. 11,127,636 (the "'636 patent") on September 21, 2021, after full and fair examination of Application No. 15/937,035, which was filed on March 27, 2018, which claims priority to provisional application No. 62/477,082, which was filed on March 27, 2017. *See* '636 patent. A certificate of correction was issued for the '636 patent on February 22, 2022. *See id.*

156.    Orion Labs owns all substantial rights, interest, and title in and to the '636 patent, including the sole and exclusive right to prosecute this action and enforce the '636 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

157.    The claims of the '636 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the operation of previous communication devices and systems by using bot messaging.

158.    The written description of the '636 patent describes in technical detail each limitation

of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

159.    In general, the '636 patent is directed to bot group messaging using general voice libraries.  '636 patent at 1:55-57.  The claims of the '636 patent are directed to methods, apparatuses, and computing systems for managing audio messaging between user nodes and bots in a group, utilizing voice libraries for processing recorded audio into enhanced text for bot interaction.  '636 patent at Abstract. The technology focuses on enabling bots to perform tasks over a network, including user-oriented and group-oriented bot functionalities, with applications in automated communication and commercial services. This patent teaches advancements over the bot technologies of March 2017 by introducing group messaging services that allow interaction between user nodes and bots using general voice libraries.  *See* Zatkovich Decl., ¶80.

**A. The Technical Problems That Existed In Bot Technology And Messaging In March 2017.**

160.    The specification of the '636 patent provides detailed information about the problems regarding intelligent agent features for wearable personal communication nodes in March 2017. '636 patent at 1:51-55; *see also* Zatkovich Decl., ¶83.

161.    According to the teachings of the '636 patent, "[w]ith the [then] worldwide proliferation of the internet, providing goods and services to users and consumers ha[d] become more commonplace and automated." '636 patent at 1:14-16.  One way of "automatically providing increased numbers of goods and services [wa]s through bots." '636 patent at 1:16-18; *see also* Zatkovich Decl., ¶84.

162.    "An internet bot, also known as web robot, WWW robot or simply bot, is a software

application that runs automated tasks (scripts) over the internet. Typically, bots perform tasks that are both simple and structurally repetitive, at a much higher rate than would be possible for a human alone." '636 patent at 1:18-23. In March of 2017, "[t]he largest current use of bots [wa]s in web spidering or web crawling, in which an automated script fetches, analyzes and files information from web servers at many times the speed of a human." '636 patent at 1:23-27. At that time, "[m]ore than half of all web traffic [wa]s made up of bots." *Id.*; *see also* Zatkovich Decl., ¶85.

163.    "Some bots communicate with other users of internet-based services, via Instant Messaging (IM), Internet Relay Chat (IRC), or another web interface such as Facebook bots and Twitterbots. These chatterbots may allow people to ask questions in plain English and then formulate a proper response." '636 patent at 1:28-33. It is also well known in the industry that different types of bots were (and are) used for different applications or tasks. Examples of different types of tasks include: "reporting weather, zip-code information, sports scores, converting currency or other units, etc. ... entertainment, such as SmarterChild on AOL Instant Messenger and MSN Messenger." '636 patent at 1:33-40; *see also* Zatkovich Decl., ¶86.

164.    Of primary interest in the '636 patent is the use of bots in "voice activated services." The specification teaches that in March of 2017 there were also "[g]eneral-purpose bots, such as Amazon's Alexa, Microsoft's Cortana, Google's Assistant, and Apple's Siri[.]" ''636 patent at 1:42-43. These general-purpose bots were "digital personal assistants able to provide a wide range of consumer-oriented voice-activated services, including turning lights on/off, controlling appliances, playing requested music from services such as Pandora or Spotify, providing requested information, or ordering products or services." ''636 patent at 1:44-49; *see also* Zatkovich Decl., ¶87.

165.     While the then-current bots were primarily designed to merely provide information back to a requesting user, or in the case of general purpose bots, sometimes to control devices, like Alexa, Corana, Google's Assistant, and Siri, there was a need "to create a new generation of messaging services that allow groups of users to interact with both user-oriented bots as well as group-oriented bots." '636 patent at 1:14-16.   Specifically, there was the need for the provision of different types of bots that could perform different applications into different service message groups that can utilize specialized voice libraries and natural language units.  *See* Zatkovich Decl., ¶88.

166.     The '636 Patent in particular discusses the technical problem associated with more sophisticated consumer-oriented voice-activated services that provide enhanced functionality beyond providing information back to a requesting user.   For example, "a bot 208 may be associated with one or more commercial services 404 that may allow purchase, sale, or other financial or more complex transactions." '636 patent at 6:55-58; *see also* Zatkovich Decl., ¶89..

167.     The invention is directed to the association of different bots that perform specific applications into different service message groups.   The user members of those different groups can perform voice activated requests to be executed by a particular bot application of that group. The invention improves the technology of sending voice activation requests to bots by enhancing the processing of the voice request.   This is done by selectively using different voice libraries, speech-to-text engines, and/or natural language processors best suited for the tasks of a particular bot.  *See* Zatkovich Decl., ¶90.

## B.  The Advances Of The Bot Group Messaging Patents

168.     As taught by the specification, the invention of the '636 patent solved the technical problems that existed by providing "advantages for bot environments."   '636 patent at 1:55-56. *See* Zatkovich Decl., ¶91.

169.    Overall, the claims are directed at enabling efficient, automated communication between user nodes and bots in group messaging environments, leveraging voice libraries for enhanced functionality. '636 patent at 1:56-57, 3:41-43. The '636 patent teaches advancements over the bot technologies of March 2017 by introducing group messaging services that allow interaction between user nodes and bots using general voice libraries. These advancements include:

a.    **Integration of Bots in Group Messaging**: The patent enables bots to be incorporated into groups, allowing both user-oriented and group-oriented bots to interact with multiple users in a group setting.

b.    **Use of Voice Libraries**: It introduces the use of voice libraries, which include speech-to-text engines and natural language units, to process recorded audio into enhanced text. This enhanced text is optimized for bot processing, improving the accuracy and efficiency of bot responses.

c.    **Support for Shared and Per-User Bots**: The patent provides mechanisms for configuring bots as either shared bots (accessible to all members of a group) or per-user bots (dedicated to specific users), offering flexibility in bot functionality.

d.    **Commercial Service Integration**: Bots can be associated with commercial services, enabling transactions such as purchases or financial operations. The system supports secure verification processes for such transactions.

e.    **Automated Messaging Flow**: The patent describes detailed processes for routing messages to bots, processing audio, and managing replies, ensuring seamless communication between user nodes and bots.

These advancements enhance bot functionality, scalability, and integration in group messaging environments, addressing limitations of earlier bot technologies. *See* Zatkovich Decl., ¶92.

170.    On the other hand, the '636 patent introduces advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries. These advancements include:

a.    **Bot-Specific Voice Libraries**: The patent teaches the use of voice libraries, including speech-to-text engines and natural language units, to process recorded audio into enhanced text for bots to execute commands. This allows bots to perform tasks more effectively by interpreting audio messages in a format suited to their functionality.

b.    **Group and User Bots**: It distinguishes between group bots (responsive to all members of a group) and user bots (responsive to specific user nodes). This differentiation enables tailored bot interactions within group messaging environments.

c.    **Enhanced Text Processing**: The patent describes converting recorded audio into enhanced text, which is clarified and simplified for execution by bots. This improves the accuracy and efficiency of bot responses.

d.    **Integration with Commercial Services**: Bots can interact with commercial services for tasks like order fulfillment or financial transactions. The system supports secure configurations for user or group accounts, enabling bots to handle complex transactions.

e.    **Flexible Voice Library Selection**: The system can select from multiple voice libraries, including general-purpose libraries and format-specific converters (*e.g.,* .PCU to .WAV), based on bot requirements.

f.    **Group Messaging with Bots**: The patent enables bots to be integrated into group messaging systems, allowing users to send messages to bots and receive replies or actions performed by the bots. Bots can also monitor group conversations and act on identified audio patterns.

These advancements collectively enhance the functionality, adaptability, and integration of bots in group messaging environments, surpassing the capabilities of bots available in March 2017. *See* Zatkovich Decl., ¶93.

171.    Figure 2 depicts a messaging flow for configuring a bot into a group:



**FIGURE 2**

'636 patent at Figure 2; *see also* Zatkovich Decl., ¶94.

172. The system **200** includes one or more groups **120**, each including at least one user node **108**, a group messaging service **104**, and one or more bots **204**. '636 patent at 3:66-4:1, 4:55-57. "Bots **208** are software applications for performing one or more tasks over the internet. Therefore, bots **208** are internet-connected and in most embodiments are separate from the group messaging service **104**." *Id.* at 4:57-61; *see also* Zatkovich Decl., ¶95.

173. Further,

> Bots **208** may be incorporated into group **120** by configuring each bot 208 in the group messaging service **104** . . . . Group messaging service **104** includes data structures **212** for specifying which user nodes **108** and bots **208** are in each group **120**. Each such data structure **212** includes identifiers and addresses for each user node **108** and bot **208** entity in the data structure **212**. Group messaging service **104** includes two group data structures **212**, identified as group 1 data structure **212A** and group 2 data structure **212B**. Data structure **212A** includes identifiers and addresses for each of the user nodes **108** in group 1 **120**. . . . [D]ata structure **212A** includes a user node A **108A** address and identifier, a user node B **108B** address and identifier, and a user node C **108C** address and identifier. Data structure **212B** includes a user node A **108A** address and identifier, a user node D **108D** address and identifier, and a user node E **108E**

> address and identifier. Group messaging service **104** may include
> any number of data structures **212**, and a given bot **208** may be
> included in any number of data structures **212**.

'636 patent at 4:62-5:15; *see also* Zatkovich Decl., ¶96.

174.    Figure 3 illustrates a flowchart of a bot messaging process **216**, as seen below:



'636 patent at Figure 3; *see also* Zatkovich Decl., ¶97.

175.    Notably,

> At block **312**, the group messaging service **104** has determined that
> a bot **208** is not configured in the group **120** corresponding to the
> destination group identifier, and therefore sends the received
> message **124** to the user nodes **108** within the destination group **120**.
> Addresses for the user nodes **108** within the destination group **120**
> are determined by reviewing the data structure **212** within the group
> messaging service **104** corresponding to the destination group **120**.
> Flow ends at block **312**, or the group messaging service **104** returns
> to block **304** to wait for a next received message **124**.

> At decision block **316**, the group messaging service **104** determines
> if the received message **124** should be sent to a specific bot **208**. The
> group messaging service **104** reviews the data structure **212**
> corresponding to the destination group **120**, and identifies a bot

entry **504** corresponding to the bot identifier in the received message **124**. A data structure **212** may include any number of bot entries **504**. If there is a match, and a bot entry **504** in the data structure **212** matches the bot identifier, then flow proceeds to block **320**. If there is not a match, and no bot entries **504** in the data structure **212** matches the bot identifier, then flow instead proceeds to block **312**.

At block **320**, the group messaging service **104** has identified a match between the received message **124** and the data structure **212** corresponding to the destination group **120**, and sends the message **124** to the selected bot **208**. At this point, the message **124** has been delivered to the addressed bot **208**, and the addressed bot **208** carries out one or more functions corresponding to recorded audio within the message **124**.

'636 patent at 6:12-34; *see also* Zatkovich Decl., ¶98.

176.    Figure 5A illustrates a shared bot entry 503A within a data structure **212A**, while Figure 5B illustrates a per-user bot within a data structure **212A**, as seen below:



'636 patent at Figures 5A and 5B; *see also* Zatkovich Decl., ¶99.

177.    Data structure **212** may be configured one of two ways, depending on desired bot performance within a group **120**:

In a first embodiment, data structure **212A** includes a bot entry **504A** that designates bot **208C** as a shared bot **208**. Shared bot entry **504A** includes a bot address **508A** and a bot identifier or ID **512A**. A shared bot **208** is identified by a group **120** designation within the bot entry **504A**. When a group **120** designation appears within a bot entry **504A**, the group messaging service **104** treats the

corresponding bot **208** (bot **208C**) as a shared bot within the corresponding group **120** (group 1, as shown).

. . . .

In a second embodiment, data structure **212A** includes a per-user bot entry **504B** that designates bot **208C** as a per-user bot. Per-user bot entry **504B** includes a bot address **508B** and a bot identifier or ID **512B**. A per-user bot **208** is identified by a user or user node **108** designation within the bot entry **504B**. When a user or user node designation appears within a bot entry **504B**, the group messaging service **104** treats the corresponding bot **208** (bot **208C**) as a dedicated bot **208** to a corresponding user or user node **108** (user C, as shown).

'636 patent at 7:42-64; *see also* Zatkovich Decl., ¶100.

178.    Finally, in a representative computing device **1200**, the computing device 1200 includes memory **1208**. '636 patent at 17:36-38. The memory includes data **1216** which includes data structures **212** of the present invention. *Id.* at 17:41-43; *see also* Zatkovich Decl., ¶101.

179.    It is well known in the industry that different voice libraries (*i.e.*, a set of one or more voice models) can have different vocabularies or dictionaries tailored to different tasks (*e.g.*, medical speech dictionaries, technical dictionaries, and other custom dictionaries tailored to the type of speech and/or task needed). Both speech recognition (speech-to-text) engines and voice (text-to-speech) engines utilize different "phoneme" dictionaries (defined within a voice library). Dictionaries are used within the voice models/voice libraries to allow those engines to understand or speak different sets of words or vocabularies. *See* Zatkovich Decl., ¶102.

180.    Figure 9 illustrates how Group messaging services use a selected voice library for a speech-to-text engines. The recognized speech is sent as text to the natural language unit which then produces enhanced text intended for a specific bot. The problem of performing more complex and specialized "enhance[d] functionality" in bots is solved, and the technology improved, by defining group messaging services where each group can select a specific voice library (as well as

a preferred natural language unit) that is best suited for the tasks to be performed by the bot.



FIGURE 9

'636 patent at Figures 9; *see also* Zatkovich Decl., ¶103.

181.    As described in Fig. 9 above, each Group messaging service 104 "includes a voice library" and "at least a speech-to-text engine 902 and a natural language unit 903." '636 patent at 12:51-55.  When performing a particular voice activated request "the group messaging service 104 sends the decoded audio to the speech-to-text engine 902 and the speech-to-text engine 902 converts the decoded audio into text 912." '636 patent at 12:66-13:1.  That text is then sent "to the natural language unit 903, which reviews the text 912 and converts the text 912 into enhanced text 916." '636 patent at 13:4-7.  As indicated above "[e]nhanced text 916 is clarified and simplified from text 912 into a form more suitable for presentation to a bot 208 to execute." '636 patent at 13:7-10; *see also* Zatkovich Decl., ¶104.

**C. The Claims Of The '636 Patent Provide Technical Solutions To Problems With Bot Messaging In March 2017.**

182.    The '636 patent contains 20 total claims (three independent and seventeen dependent). This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 1. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 1 is provided below:

> 1.    A method comprising:
>
> ***receiving, by a group messaging service configured to manage messaging between a plurality of user nodes in a group, a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet***;
>
> in response to receiving the message, ***searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group***;
>
> in response to determining the bot member is a member of the group, ***accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format***;
>
> ***selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry***;
>
> ***processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member***; and
>
> ***sending, by the group messaging service, the modified message to the bot member***.

'636 patent at claim 1 (emphasis added).  Several of the dependent claims to the independent claim are also presented below, which provide:

2.    The method of claim 1, further comprising:

*determining a type of bot the bot member is between:*

*a group bot responsive to any member of the group*; and

*a user bot responsive to a selected user node from the group*;

*receiving*, by the group messaging service, *a reply from the bot member in response to sending the modified message*; and

*sending the reply to the selected user node when the bot member is a user bot, and to the plurality of user nodes when the bot member is a group bot*.

3.    The method of claim 1, wherein processing the recorded audio comprises:

*converting, by a speech-to-text engine of the selected voice library, the recorded audio to text data*; and

*converting, by a natural language unit of the selected voice library, the text data to create enhanced text*, wherein enhanced text *comprises a command specially formatted for execution by the bot member*.

4.    The method of claim 3, *wherein the message further includes a message address, wherein the group messaging service extracts the message address from the enhanced text*.

5.    The method of claim 1, further comprising:

*sending the message*, by the group messaging service, *to the plurality of user nodes in response to receiving the message*.

6.    The method of claim 1, wherein selecting which of the plurality of voice libraries to use comprises:

*selecting between:*

*a voice library including a preferred speech-to-text unit and a preferred natural language unit*; and

*a voice library including a .PCU to .WAV format converter*.

7.    The method of claim 1, wherein:

*the group messaging service receives the recorded audio as encoded audio*;

*processing the recorded audio includes decoding the recorded audio* to obtain decoded audio; and

*processing the recorded audio includes processing the decoded audio*.

8.    The method of claim 1, wherein:

*the group messaging service comprises a plurality of data structures for a plurality of groups, the plurality of data structures each comprising a unique group identifier*;

*searching the data structure of the group for the bot entry* comprises:

*selecting a data structure* from the plurality of data structures *matching a target group identifier from the message*;

*reviewing the selected data structure for bot entries comprising an identifier and a bot address*; and

*determining the selected data structure comprises at least the bot entry*.

9.    The method of claim 2, wherein determining the type of bot the bot member is further comprises:

*reviewing the bot entry for the type of bot*;

*determining the bot entry corresponds to a user bot when the bot entry includes a user node identifier*; and

*determining the bot entry corresponds to a group bot when the bot entry includes a group identifier*.

'636 patent at claims 2-9 (emphasis added); *see also* Zatkovich Decl., ¶120.

183.    The other independent claims (claims 10 and 16) are also directed to subject matter that provided technical solutions to technical problems that existed in March 2017. Specifically, many, if not all, of these other independent claims claim image capturing devices with certain limitations not found in claim 1. *See* '636 patent at claim 10 (disclosing that "accessing for a bot

entry in the data structure corresponding to the bot identifier for an indicator of a voice library"
corresponds to the bot member); claim 16 (disclosing that a selected voice library from a plurality
of available voice libraries is selected to use to process the recorded audio based on the indicator
in the bot entry and that the selected voice library processes the encoded recorded audio to produce
a modified message in the target format suited to the bot member).   The dependent claims to these
independent claims 10 and 16 are directed to similar subject matter as dependent claims 2 to 9
(above).  *E.g.*, compare claim 13 *with* claim 2; *compare* claim 12 *with* claim 3; *compare* claim 18
*with* claim 5; *compare* claim 20 *with* claim 6; *compare* claim 19 *with* claim 8; *compare* claim 19
*with* claim 8.  *See* Zatkovich Decl., ¶121.

184.    Concrete and novel aspects of this invention, as described in the specification in the
previous section, are tied directly to the claim limitations in the form of algorithms and process
descriptions.  To provide some context, some of the claims are provided below (in gray shading)
preceded by an explanation of the language and how it captures the claimed advances taught by
the '636 patent.  For instance, claim 1 focuses on the interaction between a group messaging
service and bots, leveraging bot-specific voice libraries to process audio messages for enhanced
bot functionality (e.g., integration with commercial services).  Claim limitation 1.a identifies the
configuration of a group messaging service to contain users within the group, and a particular bot
software application. The bot will receive a recorded voice audio "request" message from a user
in that group to be performed by that group's bot software application.

> 1.a receiving, by a group messaging service configured to manage
> messaging between a plurality of user nodes in a group, a message
> comprising recorded audio and a bot identifier for a bot member of
> the group, a bot comprising a software application for performing a
> task over the internet;

Claim limitation 1.b determines if the message group has a bot associated with the group using the
bot identifier.

> 1.b    in response to receiving the message, searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group;

If a bot is a member of that group, claim element 1.c. identifies a voice library associated to that bot to be used to convert an audio message to a target format.

> 1.c    in response to determining the bot member is a member of the group, accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format;

Claim elements 1.d and 1.e selects the particular voice library associated with the Bot for that group, then uses that voice library to process the user's recorded audio request to produce a modified message (*e.g.,* enhanced text).

> 1.d    selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry;

> 1.e    processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member; and

In Claim element 1.f, The modified message (*e.g.,* enhanced text) is sent to the bot application to process the user's request.

> 1.f    sending, by the group messaging service, the modified message to the bot member.

The dependent claims further refine and enhance this process. For example, claim 2 provides a feature where the type of bot can either be a group bot or a single user bot. Then, based on that type of bot, sending a reply to the either the single user or to the whole group.

> 2.    The method of claim 1, further comprising:
>
> determining a type of bot the bot member is between:
>
> a group bot responsive to any member of the group; and

a user bot responsive to a selected user node from the group;

receiving, by the group messaging service, a reply from the bot member in response to sending the modified message; and

sending the reply to the selected user node when the bot member is a user bot, and to the plurality of user nodes when the bot member is a group bot.

In claim 3, the selected voice library will produce a command formatted for that particular bot (see '636 claim 3). More specifically, the speech-to-text engine and natural language unit uses the selected voice library to produce specifically formatted text (enhanced text) for the designated bot of that group. ['636 1:67-2:8].

3.    The method of claim 1, wherein processing the recorded audio comprises:

converting, by a speech-to-text engine of the selected voice library, the recorded audio to text data; and

converting, by a natural language unit of the selected voice library, the text data to create enhanced text, wherein enhanced text comprises a command specially formatted for execution by the bot member.

Claim 6 provides for further flexibility and specialization, in addition to selecting a particular voice library in claim 1, to select a preferred speech-to-text engine and a preferred natural language unit.

6.    The method of claim 1, wherein selecting which of the plurality of voice libraries to use comprises:

selecting between:

a voice library including a preferred speech-to-text unit and a preferred natural language unit; and

a voice library including a .PCU to .WAV format converter.

*See* Zatkovich Decl., ¶122.

185.    The claims of the '636 patent, including claims 1, 10, and 17, are directed to methods, systems, and devices for managing group messaging services that incorporate bots with bot-specific voice libraries to solve limitations that existed with bot technology in March of 2017.

There would have been nothing abstract about the claims of the '636 patent to a POSITA. The claims disclose specific implementations of a group messaging service that integrates bots with bot-specific voice libraries to process audio messages and perform designated actions. This involves tangible components like speech-to-text engines, natural language units, and data structures, which are technical in nature. In particular, one solution, among others, is to organize different types of bots into different service message groups based on the type of tasks or applications to be performed by using bot specific voice libraries ('636 patent at 2:28-35). For each message group, a specific voice library can be selected (*see* '636 claim elements 1.c, 1.d, 1.e). The selected voice library will produce a command formatted for that particular bot (see '636 claim 3). In addition, to selecting a particular bot-specific voice library, the bot can also select a particular speech-to-text engine and natural language unit that is best suited to produce "enhanced text" to provide designated actions to be performed by that particular bot. *See* '636 claim 6, and '636 patent at 1:67-2:8. Enhanced text, produced from the user's request, is "clarified and simplified from text 912 into a form more suitable for presentation to a bot 208 to execute." '636 patent at 13:8-10. *See* Zatkovich Decl., ¶123.

186.    A POSITA would understand that each of the claims above provided a specific improvement in bot technology that did not exist prior to March of 2017. The claims of the '636 patent are directed advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries. These advancements collectively enhance the functionality, adaptability, and integration of bots in group messaging environments, surpassing the capabilities of bots available in March 2017. For example, natural language processors can be configured with specific vocabularies and grammars tailored to handle language for particular applications or tasks that are controlled by specific bots.

These claims disclose a particular configuration of hardware and software components combined in a unique way using novel memory and data structures coupled with bot specific voice libraries. *See* Zatkovich Decl., ¶124.

187.    Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '636 patent, including claim 1, 10, and 16, are directed to a specific configuration of hardware capable of performing certain functions; in general, the claims cannot be performed by a human or by pen and paper.  In fact, the whole concepts of bots in general are to bypass the limitations of the human condition.  Problems of the type solved by the '636 patent do not exist (and therefore do not need to be addressed) outside the computer realm.  *See* Zatkovich Decl., ¶125.

188.    Finally, the claims of the '636 patent do not preempt all the ways of providing bot communication.  There is a myriad of other ways such systems could be architected, such as the prior art patents and applications identified on the face of the patent, which would not be preempted.  *See* '636 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '636 patent).  Moreover, the versions of Alexa, Corana, Google's Assistant, and Siri that existed prior to March of 2017 could still be used without coming within the scope of the claims of the '636 patent.  *See* Zatkovich Decl., ¶126.

189.    Even if the '636 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time (*e.g.*, user nodes, bots, voice libraries, and commercial services), a skilled artisan would have known that they are integrated into a cohesive system that goes beyond any generic computer implementation and demonstrates a novel

arrangement of components to achieve a specific result and was not merely the conventional use of technology that was already well known to the industry. The use of this particular combination of components in this way to improve bot technology, as disclosed in the claims highlighted above, was not known in the art and is inventive. The claims are not directed to "off the shelf" bot technology—they are directed to novel, purpose-built software functionality to address the limitations of the bot technologies that existed in March of 2017. *See* Zatkovich Decl., ¶127.

190.     Even if that were not true, the ordered combination of limitations in claims 1, 10, and 16 of the '636 patent, alone and coupled with the dependent claims described above, was not known in the art. No art, method, or system that existed at the time and that disclosed all of the limitations of claims 1, 10, and 16 in a way that solved the then-existing problems with the simpler bot technologies of the time. These claims are directed to specific solutions using technology in an inventive and unique way, as described above, to provide bot technologies solve the well-documented problems with bot technologies (*i.e.,* problem of performing more complex and specialized "enhance[d] functionality" in bots) by defining group messaging services where each group can select a specific voice library (as well as a preferred natural language unit) that is best suited for the tasks to be performed by the bot. *See* Zatkovich Decl., ¶128.

191.     For the above reasons, the claims of the '636 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl., ¶129.

## INFRINGEMENT

192.     Defendant has directly infringed one or more claims of the '636 patent by using, providing, supplying, or distributing the Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 5, 10, and 16 of the '636 patent, as detailed in **Exhibit D** (Evidence of Use Regarding Infringement of U.S. Patent No.

11,127,636).

193.    As an example of Defendant's infringement, as detailed in <u>Exhibit D</u>, the Accused Products infringe at least Claim 1 of the '636 patent by performing a method comprising: receiving, by a group messaging service configured to manage messaging between a plurality of user nodes in a group, a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet; in response to receiving the message, searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group; ) in response to determining the bot member is a member of the group, accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format; selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry; processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member; and sending, by the group messaging service, the modified message to the bot member.  The method performed comprises: sending the message, by the group messaging service, to the plurality of user nodes in response to receiving the message.

194.    Further examples of Defendant's infringement of independent claims 10 and 16 and dependent claim 5 of the '636 patent, are described in detail in <u>Exhibit D</u>, which also includes element-by-element support for the presence of each element of each of claims 5, 10, and 16.

195.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '636 patent.

196.    Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed one or more claims of the '636 patent by inducing others to directly infringe said claims.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '636 patent by providing or requiring use of the Accused Products  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '636 patent, including, for example, claims 1, 5, 10, and 16.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '636 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products by others would infringe the '636 patent.

197.    Defendant has also indirectly infringed by contributing to the infringement of the '636 patent.  Defendant has contributed to the direct infringement of the '636 patent by its personnel, contractors, distributors, and customers. The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '636 patent, including, for example, claims 1, 5, 10, and 16. Said special features, which are identified in Paragraphs 20-23, *supra*, constitute a material part of the invention of at least claims 1, 5, 10, and 16 of the '636 patent when used by the Accused Products in a normal manner and are not staple articles of commerce suitable for substantial non-

infringing use.

198.    Defendant had knowledge of the '636 patent and its infringing activities at least as of the date when it was notified of the filing of this action.

199.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

200.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

201.    Defendant's direct infringement of one or more claims of the '636 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

202.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

203.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '636 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.  The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 11,258,733

204.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1-24 above as though fully

set forth in their entirety.

205.    The USPTO duly issued U.S. Patent No. 11,258,733 (hereinafter, the "'733 patent") on February 22, 2022, after full and fair examination of Application No. 17/096,200, which was filed on November 12, 2020, and which claims priority to Application No. 16/149,692, filed on October 2, 2018, which claims priority to provisional application No. 62.567,338, which was filed on October 3, 2017. *See* '733 patent.

206.    Orion Labs owns all substantial rights, interest, and title in and to the '733 patent, including the sole and exclusive right to prosecute this action and enforce the '733 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

207.    The claims of the '733 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon audio message transcription to destination services.

208.    The written description of the '733 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

209.    In general, the '733 patent is directed to technology that "improves audio message transcription to destination services. In various implementations, a group communication system receives user node communications from and distributes user node communications to members of a communication group, wherein the communication group members comprise a plurality of user nodes." '733 patent at 1:58-64; *see also* Zatkovich Decl., ¶131.

**A.  The Technical Problems That Existed In The Electronic Group Communications In October 2017.**

210.    In October of 2017, "[p]ublishing content on media services ha[d] become commonplace. A user communicating with members of a group may [have] be[en] interested in distributing audio communications to additional end users in the form of written communication. For instance, employees who are members of a communication group may [have] want[ed] to post comments or document events in a digital workspace environment where the audio recordings from the members are published in group collaboration applications." '733 patent at 1:32-40; *see also* Zatkovich Decl., ¶134.

211.    At that time, there existed group management systems that were designed to "facilitate secure communications between multiple user nodes in a distributed communication environment." '733 patent at 1:17-19.  These systems enabled members of a defined group to communicate using devices connected to a network, such as smartphones, tablets, or other intermediate communication devices.  '733 patent at 1:19-31.  These systems were essential for managing communication channels, user identities, and group membership.  *Id.* ; *see also* Zatkovich Decl., ¶135.

212.    Then existing solutions did not allow for direct integration between group communication systems and destination services, making it difficult to deliver transcribed messages automatically.  In October of 2017, "[a] variety of solutions ha[d] been tried with respect to simplifying the delivery of an audio transcription to a destination service. However, [then-]current solutions d[id] not allow users to directly publish audio content to destination services when the audio content is received from a user node associated with a group in a group communication service." '733 patent at 1:49-54; *see also* Zatkovich Decl., ¶136.

213.    "While users [could] publish context using various destination service applications,"

the group management systems of the time were constrained and problematic in this context. '733 patent at 1:40-46.    This resulted in unnecessary complexity and inefficient workflow in transcription and publishing content (members of a group faced challenges in transcribing and publishing these messages to external destination services, requiring additional steps, other services, and manual intervention). '733 patent at 1:40-48.   It also resulted in identity mismatch, creating confusion and hindering seamless integration (with no direct correlation between the identity of a group member in the communication system and the identity used for publishing transcribed messages in destination services). *Id.*; *see also* Zatkovich Decl., ¶137.

214.    The system facilitates secure group communication and enables transcription of audio messages into text for delivery to destination services.   This is particularly useful for emergency responders who need to share critical information quickly and efficiently in noisy or chaotic environments.   These problems were particularly important to certain types of groups, including, "for instance, a group of emergency responders communicating about a natural disaster, or any other type of organization that may be audio data may be connected for group communications." '733 patent at 3:20-27.    Other groups where the then-current limitations were particularly problematic were for firefighters dealing with a complex configuration, law enforcement personnel in a SWAT or hostage rescue situation, military personnel in live combat, and other communication groups that require clear transcripts and whose voice traffic must be accurately associated with individual members and available substantially in real time to supervisory personnel to facilitate actions to be taken in support of that group.   *See* Zatkovich Decl., ¶138.

215.    Depending on the urgency and importance of the group communications, the inability to transcribe in real time and accurately associate the audio messages with their source node (group member) could be catastrophic to the active communication group (and the people or property that

group with whom that group is dealing). This was a serious problem in electronic group communications in October of 2017. *See* Zatkovich Decl., ¶139.

### B. The Claimed Advances Of The '733 Patent.

216.    The technical advancements taught in the '733 patent allow audio messages to be transcribed and published directly to external platforms (*e.g.,* collaborative applications, social media) while maintaining the identity of the user or group. In doing so, the '733 patent provides a way to efficiently transcribe and deliver audio messages from group communication systems to external destination services, such as collaborative applications or social media platforms, by providing for real-time transcription and delivery processes, enabling efficient communication and collaboration among group members. *See* Zatkovich Decl., ¶140.

217.    As taught by the specification, the invention of the '733 patent solved the technical problems that existed pertaining to electronic group communications, and specifically, where real time audio message transcription and association was required "by launching a bot node to deliver a transcribed audio message to the destination services, so that a recorded audio message from a user node can be published on the destination services in the transcription process." '733 patent at 2:66-3:4; *see also id.* at 1:58-59; *see also* Zatkovich Decl., ¶141.

218.    "With the user nodes distributing audio communications between one another within their associated communication groups, the group communication service may then receive a request or otherwise determine that an audio message needs to be transcribed and delivered to a destination service. The request may be received from one or more user nodes based on a member operating the user node interacting with the end- user device using a button, a key, a gesture, a voice command, and the like. The request may also be determined based on an instruction from an administrator or leader of the communication group." '733 patent at 3:65-4:8; *see also* Zatkovich Decl., ¶141.

219.    "In operation, group communication service 101 receives an audio transcription request from one or more of user nodes 111-112 ( step 201 ) . The audio transcription request may be provided by one member of the group , multiple members in the communication group , or specific members in the group , such as an administrator or group leader." '733 patent at 4:61-66. "The program instructions direct the underlying physical or virtual computing system or systems that provide group communication service 101 to operate[.]" '733 patent at 4:57-60.    By provisioning these functions in suitably constructed and programmed bots, the resulting system enables clear, accurate delivery in real time of transcripts associated with users to monitoring and supervisory personnel for correct and timely action in support of the current situation of the communication group. *See* Zatkovich Decl., ¶143.

220.    Figure 3 depicts a publishing process employed by a bot node in embodiments of enhanced audio message transcription to destination services.



'733 patent at Figure 3; *see also* Zatkovich Decl., ¶144.

221.    "As part of publishing process **300**, bot node **120** is launched by group communication service **101** (step **301**). Bot node **120** may be launched for a specific group of user nodes **111-112**, or be launched on behalf of group communication service **101** or destination service **130**." '733 patent at 6:38-43.  Further,

> Bot node **120** may receive instructions to locate required destination service **130** as determined by data stored in group communication service **101** associating the identity of user node **111** initiating the transcription request (step **302**). Bot **120** can be instantiated (physically and/or virtually) inside group communication service **101**, instantiated (physically and/or virtually) inside destination service **130**, or can be configured as a bot node in some other way. Bot node **120** locates the subscribed destination service **130** (step **303**).

'733 patent at 6:44-53 (emphasis added); *see also* Zatkovich Decl., ¶145.

222.    Figure 7 depicts a computing system suitable for implementing the group communication technology:



**FIGURE 7**

'733 patent at Figure 7; *see also* Zatkovich Decl., ¶146.

223.    The disclosure in Figure 7 is tied to physical components for several reasons, as

discussed below:

> Computing system **701** includes, but is not limited to, processing system **702**, storage system **704**, software **705**, communication interface **707**, and user interface system **709**. Processing system **702** is operatively coupled with storage system **703**, communication interface system **707**, and user interface system **709** (optional).

> Processing system **702** loads and executes software **705** from storage system **703**. Software **705** includes process **706**, which is representative of the processes discussed with respect to the preceding [Figures], including transcribing process **200** and publishing process **300**. When executed by processing system **702** to enhance audio message transcription to destination services, software **705** directs processing **702** to operate as described herein. . . .

> Referring still to FIG. 7, processing system **702** may comprise a micro-processor and other circuitry that retrieves and executes software **705** from storage system **703**. Processing system **702** may be implemented within a single processing device, but may also be distributed across multiple processing devices or sub-systems that cooperate in executing program instructions.

'733 patent at 11:32-56.  Ultimately,

> *[S]oftware 705 may*, when loaded into processing system **702** and executed, *transform a suitable apparatus, system, or device (of which computing system 701 is representative) overall from a general-purpose computing system into a special-purpose computing system to enhance audio message transcription to destination services. Indeed, encoding software 705 on storage system 703 may transform the physical structure of storage system 703*. The specific transformation of the physical structure may depend on various factors in different implementations of this description.

> . . . .

> For example, if the computer-readable storage media are implemented as semiconductor-based memory, *software 705 may transform the physical state of the semiconductor memory when the program instructions are encoded therein, such as by transforming the state of transistors, capacitors, or other discrete circuit elements constituting the semiconductor memory. A similar transformation may occur with respect to magnetic or optical media*. Other transformations of physical media are possible without departing from the scope of the present description, with the

foregoing examples provided only to facilitate the present discussion.

'733 patent at 12:38-63 (emphasis added); *see also* Zatkovich Decl., ¶147.

## C. The Claims Of The '733 Patent Provide Technical Solutions To Problems With Group Communications In October 2017.

224.    The '733 patent contains 20 total claims (three independent and seventeen dependent). This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 1. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 1 is provided below:

1.    A method comprising:

operating a group communication service, including:

***receiving user node communications from and distributing user node communications to members of a communication group, wherein the members comprise a plurality of user nodes***;

***receiving an audio transcription request from a selected user node*** of the communication group;

***determining a bot node member of the communication group to launch based on an identifier of the communication group***;

***launching the bot node member to deliver transcribed content messages to a destination service***;

***receiving an audio content message from the one of the plurality of user nodes***; and

***delivering a transcribed content message of the audio content message to the destination service via the bot node member***.

'733 patent at claim 1 (emphasis added).  Several of the dependent claims to the independent claim are also presented below, which provide:

2.    The method of claim 1 further comprising:

*determining an IP address associated with the bot node member based on an IP address associated with the selected user node and the identifier of the communication group*; and

wherein *the transcribed content message is delivered to the destination service using the IP address associated with the bot node member*.

3. The method of claim 1 comprising operating the group communication service further includes:

*facilitating communications of multiple user node groups, including the communication group*;

*maintaining a database including associations between identifiers for user nodes, identifiers for user node groups, and bot nodes*;

*determining an identifier associated with the selected user node based on the audio transcription request*;

*determining a user node group associated with the audio transcription request from the multiple user node groups using the database*; and

*determining the bot node member to launch* for the audio transcription request using the database.

4. The method of claim 3 further comprising:

*determining the destination service based on an association between the destination service and the communication group* in the database.

5. The method of claim 1 comprising operating the group communication service further includes:

*delivering a plurality of transcribed audio content messages* from a plurality of user nodes of the communication group to the destination service, *via the bot node member, for publication on the destination service*.

6. The method of claim 1 comprising operating the group communication service further includes:

*receiving the audio transcription request as an audio voice message*; and

---

> *broadcasting the audio transcription request to the members of the communication group*.

7. The method of claim 1 comprising operating the group communication service further includes:

> *receiving a transcribed message from the destination service via the bot member*; and

> *converting the transcribed message into an audio message*; and

> *broadcasting the audio message to the members of the communication group*.

'733 patent at claims 2-7 (emphasis added); *see also* Zatkovich Decl., ¶148.

225.    The other independent claims (claims 8 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in October 2017.  While claim 1 describes a method for operating a group communication service and the steps involved in receiving user communications, launching a bot node, transcribing audio messages, and delivering transcribed content to a destination service while keeping track of the source of the messages, claim 8 is directed to an apparatus (a computing system) configured to perform the same operations as described in claim 1, the apparatus including a processor that executes the necessary operations, such as receiving communications, launching a bot node, transcribing audio messages, and delivering transcribed content.  Claim 15 is directed to a memory device that stores instructions to cause the system to perform the operations described in claim 1.  Dependent claims 9 to 14 and 16 to 20 roughly approximate the additional limitations claimed in dependent claims 2 to 8.  *Compare* 16 and 2; *compare* 17 *with* 3; *compare* 11 and *with* 4; *compare* 12 and 18 *with* 5; *compare* 19 *with* 6; *compare* 14 and 20 *with* 7; *see also* Zatkovich Decl., ¶149.

226.    These claims are not directed to any abstract idea.  The claims in this patent are directed to a specific technological solution to a practical problem in group communication

systems. Specifically, the invention addresses the challenge of transcribing audio messages in a group communication system and delivering them to destination services in a seamless and automated manner. This is not merely an abstract idea but a specific implementation of a communication system that involves, among other specific requirements, launching a bot node to deliver transcribed messages, associating IP addresses of user nodes and bot nodes to ensure proper delivery, transcribing audio content into text using internal or external transcription services and delivering transcribed messages to destination services for publication. *See* Zatkovich Decl., ¶150.

227.    A POSITA would understand that each of the claims above provided a specific improvement in group communication systems that did not exist prior to the October of 2017. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of software and hardware to solve problems with group communication systems that existed in October of 2017. These steps involve specific technical processes that improve the functionality of group communication systems, making them more efficient and capable of handling transcription and delivery tasks without manual intervention. The inventions of the '733 patent enables bidirectional communication, where transcribed messages can be sent to destination services and incoming messages can be received, converted, and delivered back to the communication group. To accomplish this, the '733 patent recites a special purpose method/system/device composed of software and hardware components combined in a unique way to keep track of, transcribe, and maintain source identification for audio messages received in a group communication system using a bot node and a specific transcription process. The claims are rooted in computer technology and solve a problem specific to distributed communication environments, which is far removed from any abstract idea. *See* Zatkovich Decl., ¶151.

228.    Nor are these claims directed at subject matter that can be performed by a human,

mentally or with pen and paper.  The claims of the '733 patent, including claims 1, 8, and 15, involve automated processes that require the use of computing systems, communication networks, and software to perform tasks that are beyond the capabilities of a human, whether mentally or with pen and paper. The claims describe the process of launching a bot node within a group communication system to deliver transcribed messages to destination services.  This involves real-time integration of the bot node into the communication group, which requires interaction with networked systems, IP address associations, and automated instructions.  Humans cannot dynamically launch a bot node or manage IP address associations manually in real time. This process requires computing infrastructure and software to execute.  *See* Zatkovich Decl., ¶152.

229.    Moreover, the claims of the '733 patent do not preempt all the ways of communicating electronically in a group environment, and in fact, does not even pre-empt all ways of transcribing messages in an electronic group setting.  There are countless other ways such systems could be architected, such as by using those systems described in the ten prior art patents and applications identified on the face of the patent.  *See* '733 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '733 patent).  You could also do this without employing a bot and would avoid coming within the scope of the patent.  *See* Zatkovich Decl., ¶153.

230.    Even if the '733 patent claims were directed at an abstract idea, which no POSITA would reasonably believe, the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time (bots, nodes, processors, communication groups, messages, and audio content), they are employed together here in a way that was new and certainly would not have been considered conventional, routine, or generic to those skilled in the art).  The use of this particular combination of hardware and software

components in this way to improve the electronic group communication systems that existed in October of 2017 by launching a bot node to deliver messages, associating IP addresses of user nodes and bot nodes to ensure proper delivery, transcribing audio content into text using internal or external transcription services, and delivering transcribed messages to destination services for publication, as claimed in the various forms in the claims highlighted above, was inventive. *See* Zatkovich Decl., ¶154.

231. Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, (C) and (E) independent claim 15, coupled with its various dependent claims 16-20, of the '733 patent, as recited and described in detail above, were not well-known in the art. No art or system existed at the time that disclosed all of these limitations in a way that solved the then-existing problems with electronic group communication systems where there was a need for transcription services. These claims do not merely employ known generic components in a conventional or routine way, but instead, they are directed to specific solutions using technology in an inventive and unique way, as described above, to improve the functionality of group communication systems by enabling bidirectional communication with real-time integration of a bot node, where transcribed messages can be sent to destination services and incoming messages can be received, converted, and delivered back to the communication group and accurately maintaining the identity of the source of the messages. *See* Zatkovich Decl., ¶155.

232. For the above reasons, the claims of the '733 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl., ¶156.

INFRINGEMENT

233.    Defendant has directly infringed one or more claims of the '733 patent by making, using, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing the Accused Products.  For instance, Defendant has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claims 1. 5, and 15 of the '733 patent, as detailed in **Exhibit E** (Evidence of Use Regarding Infringement of U.S. Patent No. 11,258,733).

234.    As an example of Defendant's infringement, as detailed in Exhibit E, the Accused Products infringe at least Claim 1 of the '733 patent by performing a method comprising: operating a group communication service, including: receiving user node communications from and distributing user node communications to members of a communication group, wherein the members comprise a plurality of user nodes; receiving an audio transcription request from a selected user node of the communication group; determining a bot node member of the communication group to launch based on an identifier of the communication group; launching the bot node member to deliver transcribed content messages to a destination service; receiving an audio content message from the one of the plurality of user nodes; and delivering a transcribed content message of the audio content message to the destination service via the bot node member. The method comprises operating the group communication service further includes: delivering a plurality of transcribed audio content messages from a plurality of user nodes of the communication group to the destination service, *via* the bot node member, for publication on the destination service.

235.    Further examples of Defendant's infringement of independent claim 15 and dependent claim 5 of the '733 patent are described in detail in Exhibit E, which also includes element-by-element support for the presence of each element of each of claims 5 and 15.

236.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '733 patent.

237.    Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed one or more claims of the '733 patent by inducing others to directly infringe said claims.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '733 patent by providing or requiring use of the Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '733 patent, including, for example, claims 1. 5, and 15.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '733 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products by others would infringe the '733 patent.

238.    Defendant has also indirectly infringed by contributing to the infringement of the '733 patent.  Defendant has contributed to the direct infringement of the '733 patent by its personnel, contractors, distributors, and customers.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '733 patent, including, for example, claims 1. 5, and

15. Said special features, which are identified in Paragraphs 20-23, *supra*, constitute a material part of the invention of at least claims 1. 5, and 15 of the '733 patent when used by the Accused Products in a normal manner and are not staple articles of commerce suitable for substantial non-infringing use.

239.    Defendant had knowledge of the '733 patent and its infringing activities at least as of the date when it was notified of the filing of this action.

240.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

241.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

242.    Defendant's direct infringement of one or more claims of the '733 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

243.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

244.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '733 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.  The public

interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## JURY DEMAND

245.    Orion Labs hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

246.    Orion Labs requests that the Court find in its favor and against Defendant, and that the Court grant Orion Labs the following relief:

a.    Judgment that one or more claims of each of the Asserted Patents has been infringed, either literally or under the doctrine of equivalents, by Defendant or others acting in concert therewith;

b.    A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of claims of the Asserted Patents; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of said patents by such entities;

c.    Judgment that Defendant accounts for and pays to Orion Labs all damages to and costs incurred by Orion Labs because of Defendant's infringing activities and other conduct complained of herein;

d.    Judgment that Defendant's infringements of one or more claims of the Asserted Patents be found willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

e.    Pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

f.    That this Court declare this an exceptional case and award Orion Labs its reasonable

attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

g. All other and further relief as the Court may deem just and proper under the circumstances.

Dated: <u>June 27, 2025</u>                    Respectfully submitted,

By: <u>*/s/ James F. McDonough, III*</u>

James F. McDonough, III (GA 117088)*
Jonathan R. Miller (GA 507179)*
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866, -1863
Email: jim@rhmtrial.com
Email: miller@rhmtrial.com

Jonathan L. Hardt (TX 24039906)*
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

*Attorneys for Plaintiff ORION LABS TECH, LLC*

*Admitted to the Western District of Texas

**List Of Exhibits**

    A.  Evidence of Use Regarding Infringement of U.S. Patent No. 10,110,430

    B.  Evidence of Use Regarding Infringement of U.S. Patent No. 10,462,003

    C.  Evidence of Use Regarding Infringement of U.S. Patent No. 10,924,339

    D.  Evidence of Use Regarding Infringement of U.S. Patent No. 11,127,636

    E.  Evidence of Use Regarding Infringement of U.S. Patent No. 11,258,733

**List of Attachments**

- Declaration of Ivan Zatkovich ("Zatkovich Decl.")

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY on this day I caused the foregoing document to be electronically-filed with the Clerk of Court using the Court's CM/ECF system.   As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated: <u>June 27, 2025</u>

By: <u>*/s/ James F. McDonough, III*</u>

James F. McDonough, III